UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

JAYSON J.[1],                          )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )          CIVIL NO.  2:19cv175
                                       )
ANDREW SAUL,                           )
Commissioner of Social Security,       )
                                       )
          Defendant.                   )

<u>OPINION AND ORDER</u>

     This matter is before the court for judicial review of a final decision of the defendant
Commissioner of Social Security Administration denying Plaintiff's application for Disability
Insurance Benefits (DIB) and Supplemental Security Insurance (SSI), as provided for in the
Social Security Act. 42 U.S.C. § 423(a), § 1382c(a)(3).  Section 405(g) of the Act provides, inter
alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the
record including the evidence upon which the findings and decision complained of are based.
The court shall have the power to enter, upon the pleadings and transcript of the record, a
judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without
remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to
any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

     The law provides that an applicant for disability insurance benefits must establish an
"inability to engage in any substantial gainful activity by reason of any medically determinable
physical or mental impairment which can be expected to last for a continuous period of not less
than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental

---

[1]  To protect privacy, Plaintiff's full name will not be used in this Order.

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.    The claimant has not engaged in substantial gainful activity since February 29,

2016, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: anxiety, autistic disorder, a personality disorder, and a seizure disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform work at all exertional levels, except he can occasionally balance, but he [can] never climb ladders, ropes, or scaffolds, never work at unprotected heights, never around moving mechanical parts, and never operate a motor vehicle for work. He is limited to performing simple, routine, repetitive tasks; simple work-related decisions; and few changes in a routine work setting. He can never tolerate exposure to the general public. He can work in proximity to others, but only with brief, incidental interaction with others and no tandem job tasks requiring cooperation with other workers to complete the task. Also, he can work where supervisors occasionally interact with him throughout the work day.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on September 10, 1991 and was 24 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since February 29, 2016, the date the application was filed (20 CFR 416.920(g)).

(Tr. 17 - 22).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed his opening brief on November 1, 2019. On December 11, 2019, the defendant filed a memorandum in support of the Commissioner's decision, to which Plaintiff replied on January 2, 2020. Upon full review of the record in this cause, this court is of the view that the ALJ's decision must be remanded.

A five-step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

In his application for disability, Plaintiff alleged impairments including autism and related disorders, Asperger's Syndrome, seizure disorder, and a cyst in his brain. (AR 69.)

Plaintiff was diagnosed with severe (AR 73, 85) autism spectrum disorder (AR 199, 314,

429) which was characterized as pervasive developmental disorder ("PDD") and Asperger's

Syndrome (AR 403, 472.) His Asperger's Syndrome was documented formally as such in the

record. (AR 403.) These disorders caused Plaintiff to have difficulty with changes in routine,

tasks, and being in social settings, as he became easily overwhelmed. (AR 250, 313, 436.) In

some assessments, care providers characterized his difficulty in social situations as an anxiety

disorder. (AR 472); (*see also* AR 73, 85, 314.)

Plaintiff's seizure disorder was documented in the record as a severe type of minor motor

seizure (AR 73, 85) and complex partial seizure (AR 403.) This type of seizure disorder caused

Plaintiff to have focal seizures, where he would freeze and stare off for a while before becoming

aware of his surroundings again. (AR 47-48, 52, 257.) He had these seizures a few times a week.

(AR 49, 53, 403.) Plaintiff suffered from seizure disorder since he was about eight or nine years

old. (AR 312.) In his childhood he suffered multiple severe convulsive seizures that caused left

temporal lobe damage and resulted in severe short and long-term memory problems. (AR 312,

403.) An EEG in March 2010 showed left temporal theta slowing, meaning abnormal brain

activity in that area, which is a common finding in young adults with developmental slowing and

sometimes causes drowsiness and affects sleep cycles which Plaintiff had, by way of drowsiness

throughout the day and difficulty falling sleeping and staying asleep. (AR 249, 403-04). In April

2013, a repeat EEG showed no abnormality in the left temporal region of the brain but left

temporal theta slowing can be intermittent depending on the severity of the dysfunction so the

latest scan cannot necessarily show that this abnormality no longer affects Plaintiff. *Id*. He had

not had a convulsive seizure since 2006, but continued to have memory issues as a result of the

brain damage he suffered. (AR 403, 491.) Due to his memory problems, Plaintiff could not

remember things day to day, had difficulty following directions, and needed continuous reminders to do any chores around the home. (AR 44-45, 250, 491.)

Plaintiff's cyst was documented in the record by an MRI that showed a cyst on his pineal gland. (AR 404.)

Plaintiff's medical record was reviewed initially by Amy S. Johnson, Ph.D. (AR 78), and on reconsideration by Kenneth Neville, Ph.D. (AR 91), and he additionally underwent a consultative assessment by Irena M. Walters, Psy.D. (AR 312.)

Dr. Johnson and Dr. Neville found that Plaintiff had medically determinable impairments of severe minor motor seizures, severe autism, and non-severe anxiety. (AR 73, 85.) They also opined that Plaintiff's allegations of pain and symptoms could be reasonably supported by these medical impairments and that his social limitation allegations were substantiated by the medical evidence alone. (AR 74-75, 87.) They concluded that that he had moderate limitations in the ability to concentrate and pay attention, but could reasonably complete tasks with reasonable pace and persistence. (AR 78, 90.) He was limited to superficial, casual interactions with others. *Id.* Also, he had the mental capacity to understand, remember, and follow simple instructions. *Id.*

Dr. Walters diagnosed Plaintiff with autism spectrum disorder, Asperger's Syndrome, and unspecified anxiety disorder. (AR 314.) She noted that childhood seizures caused left temporal lobe damage in Plaintiff's brain which resulted in memory issues that were diagnosed around the age of 8 or 9. (AR 312.) She also noted that he had poor to fair concentration and fair perseverance. (AR 313.) She noted he had a slow rate of speech, did not like being around others as it caused him anxiety and sometimes overwhelmed him to the point of tears around large groups and crowds. *Id.*

Dr. Chao Gong, MD assessed Plaintiff in three examinations from May 16, 2016 through February 27, 2017. (AR 343, 373, 403.) In his most recent examination, he diagnosed Plaintiff with complex partial seizure, Asperger's Disorder, and insomnia. (AR 403.) He noted a history of seizures since childhood but no convulsive seizures since 2006. *Id*. Instead, he would have transient staring spells that lasted under a minute and happen a few times per week. *Id*. He did not drive because of the risk these spells presented. *Id*. He most recently had a seizure on July 5, 2016 composed of falling and confusion and lasting under a minute. *Id*. Afterwards, he remained confused and fatigued for about an hour. *Id*. Dr. Gong also noted that Plaintiff would become lightheaded for a few seconds with when he shifted positions. *Id*. He also noted that Plaintiff's insomnia was composed of fragmented sleep where he would wake up at midnight and have difficulty falling back asleep. *Id*. Finally, he noted intermittent left temporal theta slowing found by EEG scans in March 2010 and April 2013 and a pineal cyst found by an MRI. (AR 404.)

Ms. Sheryl Bolin, a licensed clinical social worker, assessed Plaintiff in 20 examinations from November 1, 2016 through January 19, 2018. (AR 429-31, 436, 438, 440, 442, 444, 446, 448, 450, 452, 455, 457, 461, 463, 465, 467, 470, 472.) In her most recent examination, she noted he had anxiety disorder which was evidenced by his social phobia and difficulty with communication. (AR 472.) She also noted that he was on the PDD spectrum and had seizures. *Id*. Over the course of their 20 sessions Plaintiff was able to increase the level of communication with Ms. Bolin but still exhibited the same amount of anxiety. (AR 472.) In the past, she also noted that he had intellectual functioning disability as evidenced by his autism and history of learning disabilities. (AR 465.) Throughout these examinations she noted that he had memory problems that presented when she tried to work through emotional issues with him, like his

trouble with expressing emotion or recognizing his own emotions. (AR 429-30, 450, 465.)
Plaintiff could not remember his emotional reactions to past events and even to major ones like
the passing of his grandmother. (AR 452, 457, 461.) Ms. Bolin also noted that he had a severe
social phobia that caused emotional outbursts in public and it was part of the reason he did not
want to leave the house. (AR 463.) His outbursts could be caused by crowds or any
overstimulation and resulted in severe emotional breakdowns and even physical vomiting. (AR
436.) In a medical statement for Plaintiff's disability claim, Ms. Bolin noted that he had marked
limitations in most of the listed work-related functions. (AR 490-91.) She also noted that his
memory issues kept him from remembering things day to day and affected his ability to follow
directions and that he had difficulty operating outside of his set schedule and became every
distressed if that was required. (AR 491.)

At the April 2, 2018 hearing (AR 28), Plaintiff testified as being unable to find work or to
actually work because he was unable to leave the house (AR 36.) He had never worked in his life.
(AR 36, 38.) He explained that he only left the house to see a friend who was the son of a special
education teacher and understood his needs. (AR 37, 436.) He relied on his mother to drive him
and pick him up from his friend's house. (AR 37.) Plaintiff's mother testified that her son
suffered from Asperger's and seizure disorder. (AR 39.) She had first found out about his
developmental difficulties when he was seven years old, based on his tendency to isolate himself.
(AR 39.) He would spend time alone, did not like to play with others, and did not talk a lot. (AR
40.) In school he had problems socializing, and with reading, comprehension, and writing. *Id*. He
could not do anything on paper and that kept him from graduating. *Id*. He was only able to obtain
a GED because it did not require an essay or writing skills. *Id*. He could not drive because of his

limitations. (AR 41-42.) His limitations in concentration would cause him to run stop signs, red lights, and pull in front of people, and it became a hazard to the point where he stopped practicing driving altogether. *Id*. A normal day for him was spent in his room where he would only come out to eat and do small chores like letting the dogs out. (AR 42.)

Plaintiff's mother testified that Plaintiff had trouble interacting with other people, and accepting instructions from others. (AR 42.) Sometimes he would have meltdowns if there was too much stimulation in the room either in the form of noise, lights, people, or a task that was too demanding. (AR 43.) For example, Plaintiff had such meltdowns before being overwhelmed by leaf-raking with his family, and being overwhelmed by the amount of people while at family gatherings or while shopping. (AR 44, 55.) His meltdowns consisted of hysterical crying and tantrums. (AR 54.) When these meltdowns happened, he had to be removed from the situation or the meltdown would become worse. *Id*. He also had limited short term memory due to left temporal lobe damage. (AR 44.) Multiple childhood seizures caused this left temporal lobe damage which was identified by a CT scan and those imaging professionals attributed the damage to his short-term memory loss. *Id*. His mother said she had to reminder him continuously for him to do anything, because he would almost immediately forget what he was told. (AR 44-45.) She had to remind him to do chores but also to take of care of his basic hygiene like to brush his teeth, shower, and even change his clothes or he would be in the same clothes for days at a time. (AR 56-57.) He would not do these things without reminders. (AR 57.)

With respect to his medication, his care provider had to increase the dosage of his anti-seizure medication recently because his seizure activity was increasing. (AR 47.) He did not have complex grand mal seizures in the frequency he used to when they started around 2014

and 2015, but would have focal seizures that caused him to stare off for 30 seconds to a couple of minutes. (AR 47-48, 52.) After the seizure activity, he needed time to regain his bearings because of confusion. (AR 48-49.) Before his care providers increased his medication on February 5, 2018, he experienced these focal seizures every few days but even after, he had spans of time where he would experience them every three days. (AR 49, 53.) The increased medication made him more tired and drowsy, but he had trouble sleeping through the night and instead would sleep in short intervals throughout the day. (AR 49).

In his first hypothetical the ALJ asked the vocational expert to assume a hypothetical person of Plaintiff's age, education, and work experience. (AR 60.) Then he asked the vocational expert to assume that the person could perform work at all exertional levels, except they could occasionally balance; never climb ladders, ropes, or scaffolds; never work at unprotected heights; never work around moving mechanical parts; and never operate a motor vehicle for work. *Id*. They were also limited to performing simple, routine, and repetitive tasks with simple work-related decisions and could tolerate few changes in routine work setting. *Id*. The ALJ added that they could never tolerate exposure to the general public but could work in proximity to others, with only brief incidental interaction, and no tandem job tasks. *Id*. This hypothetical person could occasionally interact with supervisors. *Id.* The vocational expert responded that this person could work as a general helper, a garment or clothing bagger, and laundry laborer. (AR 61.)

In his second hypothetical, the ALJ added that the individual would also require reminders once a month to perform a task. *Id.* The vocational expert said that this would not be a problem, but he clarified that reminders once a month after the initial one-month training period could be

problematic, as the person would no longer remain competitive and could be replaced. (*See* AR 61-62.) Reminders once a week would preclude someone from all work. (AR 62.) He also clarified that to stay competitive, a person could only be absent about two days in a 30-day period which includes leaving early or being particularly late. *Id.* Also, an employer could generally tolerate off-task time of up to 15%, but beyond that, a person would be precluded from work. (*See* AR 63.)

Plaintiff's counsel asked the vocational expert if a person would be precluded from work if they needed to nap throughout the day to the point where they would be off task as much as 20%. (AR 63-64.) The vocational expert responded affirmatively. (AR 64.) Counsel then asked if someone would be precluded from work if they were off pace of the average worker by 20%. *Id.* The vocational expert responded affirmatively. *Id.* Counsel then asked if someone would be precluded from work if they had a mental breakdown in response to being reprimanded or given some instructions. *Id.* The vocational expert explained that being unable to tolerate criticism would not be tolerated in an ongoing fashion. (AR 64-65.) Counsel then asked if someone would be precluded from work if they needed reminders for how to perform a task five to ten times a day. (AR 65.) The vocational expert answered affirmatively. *Id.* Counsel then asked if someone would be precluded from work for having difficulty working with coworkers and just would not want to be around co-workers. *Id.* The vocational expert explained that all of the occupations that he suggested to the ALJ would require some interaction with people throughout the day and if this hypothetical person could not tolerate that contact then they would be precluded from those suggested jobs. (AR 65-66.)

The ALJ found Plaintiff had severe impairments of anxiety, autism, personality disorder,

and seizure disorder. (AR 17.) The ALJ found that Plaintiff had the residual functional capacity to perform work at all exertional levels except that he could occasionally balance; never climb ladders, ropes, or scaffolds; never work at unprotected heights; never work around moving mechanical parts and never operate a motor vehicle for work; was limited to performing simple, routine, and repetitive tasks with simple work-related decisions; and could tolerate few changes in routine work setting. (AR 18.) The ALJ added he could never tolerate exposure to the general public but could work in proximity to others, with only brief incidental interaction, and no tandem job tasks. *Id*. He could occasionally interact with supervisors. *Id*. The ALJ found that, based on Plaintiff's age, education, work experience, and residual functional capacity there were significant number of jobs in the national economy that he could perform. (AR 21.)

In support of remand, Plaintiff first argues that the ALJ improperly assessed Plaintiff's subjective allegations. The ALJ found that Plaintiff's difficulty leaving the house, remembering; concentrating, following instructions, squatting, standing, sleeping, and difficulty with drowsiness caused by medication could be reasonably be caused by his medically determinable impairments. (AR 19.) Plaintiff contends that the ALJ then erred by finding his allegations "concerning the intensity, persistence, and limiting effects of these symptoms [] not entirely consistent with the medical and other evidence," without explaining how they were not consistent and applying an impermissibly rigorous standard of complete consistency to his evaluation of Plaintiff's subjective allegations. (AR 19); 20 C.F.R. Sec 416.1453(a); SSR 16-3p; *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014); *Jones for Jones v. Chater*, 101 F.3d 509, 512 (7th Cir. 1996).

*Murphy* explains that while this boilerplate statement does not discredit the ALJ's conclusion automatically, it could be a reversible error if the ALJ does not give sufficient

reasoning to support their ultimate determination. 759 F.3d at 816. SSR 16-3p further states the ALJ's evaluation of alleged symptoms must be sufficiently specific so that "the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Without explaining how Plaintiff's allegations were inconsistent with the medical evidence neither Plaintiff nor any subsequent reviewer could determine how the ALJ arrived at that conclusion.

Section 416.1453(a) and *Jones for Jones* establish that the standard of review in administrative proceedings is the preponderance of the evidence. 101 F.3d at 512. The preponderance of the evidence standard requires only that Plaintiff's testimony be more likely true than not and so by rejecting Plaintiff's alleged symptoms for not being entirely consistent with the evidence the ALJ violates this rule. (AR 19); Sec. 416.1453(a); *Jones for Jones*, 101 F.3d at 512; *Ralston v. Saul*, 2019 WL 5558978, *4 (N.D. Ind. October 29, 2019) ("The ALJ seemed to require complete consistency or else Ralston's testimony must be disbelieved and discounted. That's not what the regulations require. Such a process rules out the claimant's testimony as evidence because of any even minor inconsistency").

When evaluating the consistency of Plaintiff's allegations, the ALJ should have addressed each of Plaintiff's allegations and then cited to the evidence that contradicts them. *Id.* (ALJ must make and explain decisions logically based on specific record findings and evidence.) In the present case, the ALJ broadly summarized the medical record as contradicting Plaintiff's subjective allegations without citing specific evidence to support his findings regarding Plaintiff's allegations. (AR 19-20.) An evaluation of an individual's symptoms cannot be implied, and an ALJ can only make conclusions that are supported by record evidence analysis. *Golembiewski v.*

*Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003). *See Lambert v. Berryhill*, 896 F.3d 768, 777 (7th Cir. 2018) (reversing where ALJ failed to acknowledge evidence in the record that corroborated the claimant's allegations). Here, Plaintiff's subjective allegations were supported by the record, in consultative assessments by medical professional, non-medical sources, reports from his mother, and his own reports during mental health evaluations and the ALJ did not discuss these treatment notes and opinions at all in his evaluation of Plaintiff's allegations. (AR 19); *see Price v. Colvin*, 794 F.3d 836, 840 (7th Cir. 2015) (assessments should not be rejected for being based on subjective complaints of the patient as mental evaluations often depend on subjective complaints); *Phillips v. Astrue*, 413 Fed. Appx. 878, 884 (7th Cir. 2010) (non-medical source opinions should not be discredited outright and weighed according 20 C.F.R. § 404.1527 factors beforehand).

Plaintiff's allegation of difficulty leaving the house was supported by Dr. Johnson and Dr. Neville, who opined Plaintiff had social interaction limitations that restricted him to brief, superficial interactions with the public. (AR 78, 90.) Dr. Walters noted Plaintiff preferred to stay at home, had anxiety around people, and that he became overwhelmed and tearful in large groups. (AR 313.) Plaintiff's licensed clinical social worker, Ms. Bolin, noted that he isolated himself in his room (AR 448) and had fear and anxiety around others (AR 472.) She concluded that he had severe social phobia (AR 491.) His mother also reported that he did not like to leave his room unless it was to eat or let the dogs out (AR 248), he did not like the outdoors (AR 251), and had trouble being in crowds or large social gatherings to point where caused emotional outbursts, vomiting, or it caused him to emotionally shut down. (AR 252-53,436.)

Plaintiff's allegations of difficulty with memory, concentration, and following instructions

were supported by Dr. Johnson and Dr. Neville who opined he had moderate limitations in ability to maintain attention and concentrate. (AR 78, 90.) Dr. Walters noted he had memory issues from temporal lobe damage caused by multiple seizures he suffered as a child and poor to fair concentration. (AR 312-13.) Ms. Bolin noted Plaintiff had difficulty with recalling day to day occurrences (AR 491), and opined he had marked limitations in ability to maintain attention and concentrate, and to remember and carry out written or detailed instructions (AR 490.) His mother also stated that he had difficulty with memory, concentration, and following instructions in part due front lobe damage from childhood seizures. (AR 253.)

Plaintiff's allegations of difficulty with squatting and standing was supported by Dr. Gong who noted he would become lightheaded for a few seconds if he changed position. (AR 403.) His mother clarified that he had syncope episodes when standing too quickly, so he had to stand slowly if he was sitting for a long time. (AR 255.) Plaintiff's allegations of difficulty sleeping were supported by Dr. Gong who diagnosed him with insomnia that was characterized by fragmented sleep. (AR 403.) His mother also reported that he routinely had trouble going to sleep at night. (AR 249.) Plaintiff's allegations of drowsiness caused by his medication were supported by the fact that a common side effect of Levetiracetam, his seizure medication, is drowsiness. (AR 273.)

*Lambert* requires that the ALJ discuss this evidence in his evaluation of Plaintiff's allegations, and instead the ALJ made a boilerplate statement discounting his allegations without any explanation and while demanding a higher standard of proof than what was permitted in a administrative proceeding. (AR 19); 896 F.3d at 777; *Jones for Jones*, 101 F.3d at 512. The ALJ further erred by implying his analysis of Plaintiff's subjective allegations in a boilerplate

conclusion without making the necessary evidence supported analysis which compels remand in line with 7th Circuit precedent. *Murphy*, 759 F.3d at 816; *see also Golembiewski*, 322 F.3d at 916.

Plaintiff also argues that the ALJ erred by rejecting Plaintiff's mother's statements on his limitations in the Third Party Function Report, Seizure Questionnaire, and her testimony for not being a medical source, by requiring an impermissibly strict evidentiary standard, and despite record evidence that supported her reports and testimony. (AR 20); *Lambert*, 896 F.3d at 777; *Plessinger v. Berryhill*, 900 F.3d 909, 915 (7th Cir. 2018) (citing *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014)); *Golembiewski*, 322 F.3d at 917; *Jones for Jones*, 101 F.3d at 512.

First, Plaintiff contends that the ALJ erred by discounting Plaintiff's mother's opinion because she was not a medical source. (AR 20); SSR 16-3p. SSR 16-3p states that non-medical sources such as family may still provide useful insights into the intensity, persistence, and limiting effects of a claimant's symptoms despite their non-medical source status. Plaintiff's mother's testimony and reports to clinical professionals on Plaintiff's condition provide useful insight into how his impairments limit his functionality and the ALJ even acknowledged that utility. (AR 20.)

Second, Plaintiff contends that the ALJ erred by discounting his mother's testimony for not being entirely supported by the evidence. (AR 20); *Jones for Jones*, 101 F.3d at 512. The standard of review in administrative proceedings is the preponderance of the evidence and so Plaintiff's mother's testimony does not have to be entirely consistent with the evidence to be considered. 20 C.F.R. § 416.1453(a); *Jones for Jones*, 101 F.3d at 512. The preponderance of the evidence standard requires only that her testimony be more likely true than not and the ALJ

should have considered her testimony based on that standard instead of a higher one. *Id.*

Third, Plaintiff contends that the ALJ further erred by discounting Plaintiff's mother's testimony by broadly citing to "normal examinations, modest findings," and that generally Plaintiff's overall level of functioning was inconsistent and higher than what his mother's testimony suggested and medical findings showed. (AR 20); *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). *Scott* requires the ALJ to sufficiently articulate their assessment so a court can track a logical path from the evidence to their conclusion, but by making such a broad statement no court could know what the ALJ was referring to by "normal examinations" and "modest findings." *Id.* The ALJ is also not a medical professional and lacks the training to determine what findings were normal or modest and so he erred by making an independent medical finding based on his own interpretation of the objective medical evidence. *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016); *Myles v. Astrue*, 582 F.3d 672, 677-78 (7th Cir. 2009); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).

In her Third Party Function Report and testimony, Plaintiff's mother stated that he had trouble sleeping (AR 49, 249), short-term memory loss (AR 44-45, 57, 250-51), and he was prone to having meltdowns when overwhelmed by stimuli, tasks, or groups of people (AR 43-44, 54-55, 252-53.) Her reports of sleep issues are corroborated by Dr. Gong's insomnia diagnosis (AR 403) and abnormal left temporal theta slowing shown by EEG scans in March 2010 which is a common finding in young adults with developmental slowing and sometimes causes drowsiness and affects sleep cycles. (AR 404). In April 2013 a repeat EEG showed no abnormality in the left temporal region of the brain but this type of slowing can be intermittent depending on the severity of the dysfunction. *Id.* Plaintiff's mother's reports of short-term memory loss are corroborated by

Ms. Bolin, a licensed clinical social worker, who noted Plaintiff had difficulty remembering things day to day and even remembering his emotional response to significant life occurrences like the passing of his grandmother. (AR 461, 465, 491.) Plaintiff's mother's reports of meltdowns are corroborated by Dr. Johnson's and Dr. Neville's assessments that limited him to brief, superficial interactions with the public. (AR 78, 90) and Ms. Bolin who noted he fears leaving his house because of his potential to have emotional outbursts in public without knowing when they would occur (AR 463.)

In Plaintiff's mother's Seizure Report and testimony, she reported that he had focal seizures that causes him to stare off for a while until he became aware of his surroundings again. (AR 47-48, 52, 257.) Her reports of focal seizure activity are corroborated by Dr. Johnson's and Dr. Neville's diagnosis of severe minor motor seizures (AR 73, 85) and Dr. Gong's diagnosis of complex partial seizure which are characterized by freezing like motor reaction and otherwise called a focal seizure.

Plaintiff argues that the ALJ's error in evaluating Plaintiff's mother's reports and testimony were harmful because the record corroborates her statements. (AR 20); 896 F.3d at 777; *see also Price*, 794 F.3d at 840 (assessments should not be rejected for being based on subjective complaints of the patient as

mental evaluations often depend on subjective complaints). Also, an ALJ is prohibited from cherry-picking record evidence or ignoring entire lines of evidence contrary to his ruling and the ALJ did not discuss the above favorable evidence in his analysis of Plaintiff's testimony. *Plessinger*, 900 F.3d at 915 (citing *Yurt*, 758 F.3d at 859); *Golembiewski*, 322 F.3d at 917. Here the ALJ incorrectly generalized Plaintiff's mother's reports and testimony as unsupported by the

record despite record evidence support for all her key claims and without explaining how the record contradicted her claims especially in the face of this favorable evidence. *Id*.; *Scott,* 297 F.3d at 595. The ALJ also erred by holding her statements to an impermissibly high standard. *Jones for Jones*, 101 F.3d at 512.

Plaintiff also argues that the ALJ failed to adequately address Plaintiff's limited activities of daily living. SSR 16-3p requires ALJs to explain how they considered the claimant's ability to perform activities of daily living when analyzing his subjective allegations, and when considering the claimant's ability to work. In this case, the ALJ discounted Plaintiff's moderate limitation in understanding, remembering, or applying information by citing to his ability to pay bills, count change, and handle a savings account (AR 19) and while Plaintiff was skilled at math and likely could do these things (AR 251) Plaintiff required frequent reminders to perform the most basic household chores (AR 44-45, 250) and even to attend to his personal hygiene (AR 241, 250.) Plaintiff claims that the ALJ failed to accurately account for how Plaintiff's limitations affected his ability perform tasks in a competitive work environment by only citing to Plaintiff's ability to perform certain daily activities of living without examining them in aggregate. (AR 18.)

In *Roddy v. Astrue*, the Court cautioned against concluding that a person's ability to perform daily activities meant they could work full-time especially if they could only perform those daily activities with significant limitations. 705 F.3d 631, 639 (7th Cir. 2013). Likewise, here, the ALJ cited Plaintiff's daily activities to discount his limitations in performing work activities but failed to note that he can only perform those daily activities with great limitations such as relying on others to provide him constant reminders to do any chores. (AR 19, 44-45, 250.)

These omissions were harmful because the vocational expert testified that someone who required reminders more than once a week on simple tasks would be precluded from all work (AR 62) and Plaintiff requires frequent reminders to do any household chores (AR 44-45, 250.) Plaintiff also notes that the ALJ erred by not addressing this favorable vocational expert testimony in his decision even though he had solicited it from the vocational expert and especially when it would have precluded Plaintiff from all work. (AR 18, 62); *Bailey v. Barnhart*, 473 F.Supp.2d 822, 840 (N.D. Ill. 2006) (an ALJ's failure to address a claimant's limitation that a vocational expert testified would preclude her from work raised a "red flag" that needed to be addressed on remand); *see also Potrebic v. Berryhill*, 2019 WL 1397477 at*2 (N.D. Ind. Mar. 27, 2019) ("The ALJ may not ignore relevant evidence and opinions offered by the [vocational expert] without explanation. . .").

Plaintiff also claims that the ALJ erred by not explaining how factors that aggravated Plaintiff's social anxiety would affect his vocational ability to work in proximity with others. (AR 18-20); SSR 16-3p. SSR 16-3p requires an ALJ to discuss relevant factors that would aggravate a claimant's conditions while at work and limit their vocational ability. For example, Plaintiff was prone to meltdowns, sometimes involving emotional outbursts, tearfulness, and vomiting, when in public or in crowded settings. (AR 313, 436, 463, 491.) The ALJ did not explain how Plaintiff could perform work in proximity to coworkers if he could have a triggering episode in the presence of those coworkers which depending on the workplace could amount to dozens or more coworkers and therefore limit his ability to work competitively. (AR 18-20.) Therefore, a logical bridge between the ALJ's set social limitation and the record evidence cannot be drawn for the ALJ's failure to address key evidence of the extent of Plaintiff's social difficulties. *Golembiewski*,

322 F.3d at 917; *Scott*, 297 F.3d at 595.

Plaintiff also argues that the ALJ erred by not addressing the opinions of State agency consultants when analyzing Plaintiff's subjective complaints of his social interaction limitations. (AR 18.) SSR 16-3p requires that an ALJ consider State agency opinions when evaluating subjective allegations. Here the State agency consultants opined that Plaintiff's subjective allegations of his social interaction limitations were supported by objective medical evidence alone. (AR 74-75.) However, the ALJ did not explain why he did not credit these opinions despite giving the State agency opinions great weight in his residual functional capacity assessment. (AR 20.) Additionally, the State agency opinion on his social limitations were uncontested by the rest of the record medical evidence that noted Plaintiff's tendency to have emotional outbursts in public (AR 463), a marked limitation in interacting appropriately with the public, supervisors, and coworkers (AR 491), difficulty socializing (AR 199, 490), general social phobia (AR 472, 491), and difficulty in crowds (AR 253, 313, 436.) An ALJ is not permitted to cherry-pick evidence that suits his conclusion or ignores evidence that counters his conclusion. *Plessinger*, 900 F.3d at 915 (citing *Yurt*, 758 F.3d at 859); *Golembiewski*, 322 F.3d at 917. Plaintiff argues that the ALJ violated SSR 16-3p by his incomplete analysis and further erred by giving great weight to the State agency opinions when it suited his residual functional capacity assessment but not citing them at all when it did not suit his analysis of Plaintiff's subjective complaints. (AR 17, 20.)

In response, the Commissioner argues that the ALJ correctly evaluated Plaintiff's allegations because he noted his daily activities, difficulties, and complaints. The ALJ noted Plaintiff could manage his finances, play video games, care for his dogs, and prepare simple meals. The ALJ noted Plaintiff had difficulty managing stress, changes in routine, leaving his

house, memory, concentration, following instructions, sleep, squatting, and standing. *Id*. The ALJ also noted Plaintiff had drowsiness caused by medication and underwent special education due to his autism. *Id.* However, neither the Commissioner nor the ALJ explain how those facts were inconsistent with the alleged "intensity, persistence, and limiting effects" of Plaintiff's difficulties. SSR 96-8p (ALJ must explain how evidence either supports or does not support a claimant's subjective allegations); *Myles v. Astrue*, 582 F.3d 672, 667 (7th Cir. 2009) (ALJ must articulate reasons for rejecting subjective allegations); *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) (ALJ must make record evidence analysis and cannot imply his evaluation); *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (ALJ must draw a logical bridge between the evidence and his conclusion).

The ALJ found Plaintiff's alleged difficulty with verbal instructions, socializing, concentrating, handling stress and changes in routine, were inconsistent with his alleged limitations. (AR 18.) However, the ALJ erred by failing to explain how those abilities were inconsistent with Plaintiff's alleged limitations. *Id*.; SSR 96-8p; Myles, 582 F.3d at 667; *Golembiewski*, 322 F.3d at 916; *Scott*, 297 F.3d at 595. The ALJ also erred by not explaining why for example, Plaintiff's ability to follow written instructions was more significant to his vocational functioning than his difficulties with remembering verbal instructions. *O'Connor v. Spinner*, 627 F.3d 614, 621 (7th Cir. 2010); *Scott*, 297 F.3d at 595. Furthermore, the ALJ remarked that Plaintiff could manage finances (AR 18, 242.) However, the record showed no evidence that he ever managed finances, and Plaintiff's mother stated that he has never managed finances but could learn easily since he is a great mathematician (AR 251.) Thus, in addition to not explaining his conclusions, the ALJ erred by mischaracterizing evidence of Plaintiff's ability

to manage finances and by ignoring evidence that he had never managed finances. *Myles*, 582
F.3d at 667; *Golembiewski*, 322 F.3d at 917; *Scott*, 297 F.3d at 595.

The ALJ also summarized Plaintiff's allegations of having trouble leaving his house and
that his impairments caused difficulties with memory, concentration, following instructions,
squatting, and standing. (AR 19.) The ALJ also noted Plaintiff had trouble sleeping and his
medications caused drowsiness throughout the day. *Id*. The ALJ erred by making no analysis to
draw a logical bridge between these facts and his conclusion that Plaintiff's allegations were not
supported by the record evidence. *Id*.; *Scott*, F.3d at 595; *Perry v. Colvin*, 945 F.Supp.2d 949,
965-66 (N.D. Ill. 2013); *Edmonson v. Colvin*, 2016 WL 946973 at *6 (N.D. Ill. Mar. 14, 2016).

The Commissioner also argues that the ALJ did not incorrectly hold Plaintiff's allegations
to a heightened standard of "entirely consistent" with the record. The Commissioner argues
instead the ALJ considered how many of Plaintiff's allegations could "reasonably be accepted as
consistent" with the record.  However, the ALJ clearly stated he found Plaintiff's alleged
symptoms to not be "entirely consistent" with the record. (AR 19.) The Commissioner does not
cite to where ALJ considered Plaintiff's allegations in terms of reasonable consistency. There is a
substantive difference between these standards and the ALJ's heightened standard would rule out
all of Plaintiff's testimony because it could be struck down for any minor inconsistency with the
record. *Ralston v. Saul*, 2019 WL 5558798 at *4 (N.D. Ind. Oct. 29, 2019); *see also Whyte v.
Saul*, 2049 WL 5541412 at *6 (E.D. Wis. Oct. 29, 2019). Even if this was the correct standard,
the ALJ erred by not explaining how Plaintiff's allegations were not entirely consistent with the
record, as explained above. (AR 18-19); *Scott*, 297 F.3d at 595.

The Commissioner further argues that the ALJ applied the correct standard because the

ALJ credited some of Plaintiff's allegations and those allegations were reflected in his residual functional capacity ("RFC") finding. However, the ALJ's findings of moderate limitations in understanding, remembering, applying information, interacting with others, concentrating, persisting, and keeping pace were not RFC findings. (AR 18-19); 20 C.F.R. § 404.1520a(d). Rather, these ratings were given as part of the "special technique" analysis the ALJ performed at Step 3 per § 404.1520a. (AR 18.) 20 C.F.R. § 404.1520a(c)(4) states that the degree of functional mental limitations can be rated in four criteria as mild, moderate, marked, and extreme. § 404.1520a(d)(3) states that an RFC is only assessed after the ALJ rates functional limitations within those four criteria like the ALJ made, and the Commissioner incorrectly claims as RFC limits. (AR 18-19.) Furthermore, the ALJ's summary of Plaintiff's abilities to find these moderate limitations was not a proper weighing or crediting of Plaintiff's allegations as the Commissioner claims. SSR 16-3p; *see also Plessinger v. Berryhill*, 900 F.3d 909, 916 (7th Cir. 2018) (Court found the ALJ's summary of a medical opinion did not tell the reviewing Court whether the ALJ considered, dismissed, or failed to consider the evidence and constituted a failure to build the requisite logical bridge between the evidence and his conclusion). Per SSR 16-3p, the ALJ must evaluate a claimant's alleged symptoms with enough specificity so "the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *See Plessinger*, 900 F.3d at 916.

The Commissioner's attempt to draw the line between the ALJ's evaluation of Plaintiff's symptoms per § 404.1520a and the ALJ's RFC findings is impermissible post-hoc rationalization of the ALJ's decision. *Hardy v. Berryhill*, 908 F.3d 309, 313 (7th Cir. 2018) ("ALJ's decision cannot be defended on a basis not articulated in her order"). The reason why is because the ALJ

did not draw that line in his decision and the Commissioner cannot substitute his analysis for the ALJ's. (AR 18)  For example, the ALJ did not decide that Plaintiff could occasionally interact with supervisors throughout the workday based on any specific evidence in the record. (AR 18-20.) The ALJ erred by not explaining his RFC finding and for making a conclusion without supporting evidence. SSR 96-8p; *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016) (ALJ cannot make conclusions without evidence); *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). In addition, the evidence shows that Plaintiff could not sustain the ALJ's RFC. *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014); *Golembiewski*, 322 F.3d at 917 (ALJ cannot fail to address entire lines of evidence). For example, consultative record reviewing State agency physicians Amy S. Johnson, Ph.D. and Kenneth Neville, Ph.D. concluded Plaintiff was limited to brief, superficial interactions with others. (AR 78, 90-91.) Plaintiff's licensed clinical social worker opined he had a marked limitation in working in proximity to others as well as a moderate limitation in getting along with his peers without distracting them or exhibiting behavioral extremes. (AR 491.) The ALJ erred by not addressing any of these favorable facts in his decision and further erred by not explaining how, despite this evidence, Plaintiff could occasionally interact with supervisors. (AR 18-20); SSR 96-8p; *Yurt*, 758 F.3d at 859; *Golembiewski*, 322 F.3d at 917; *Briscoe*, 425 F.3d at 352.

The Commissioner argues that the ALJ did not dismiss Plaintiff's mother's testimony because she was not an acceptable medical source.  However, in his decision the ALJ plainly stated she was not a "acceptable medical source" per 20 C.F.R. § 416.913(a). (AR 20.) The Commissioner does not explain why the ALJ would "note" this fact if it was not a reason to discount Plaintiff's mother's statements.

The Commissioner's argument is wrong for an two additional reasons. First, as the Commissioner cites, the ALJ found Plaintiff's mother's statements were "not entirely supported by the record" but that is not the correct standard for evaluating the statements of a claimant's family members and other non-medical sources. 20 C.F.R. § 416.1453(a); *Jones for Jones v. Chater*, 101 F.3d 509, 512 (7th Cir. 1996). The ALJ should have analyzed whether her testimony was more likely true than not, rather than entirely supported by the record. *Id*. Second, the ALJ did not discuss her specific statements in his decision and dismissed her testimony without analysis. (AR 20); *Plessinger*, 900 F.3d at 916; *Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011) (Court found ALJ's conclusion on subjective complaints was "suspended over air" after failing to discuss those subjective complaints); *Golembiewski*, 322 F.3d at 916; *Scott*, 297 F.3d at 589. The ALJ claims he made that analysis previously in his decision. (AR 20.) However, that reasoning cannot be found as the ALJ only mentioned the mother twice, once here (AR 20), and once when describing procedural history (AR 15.) The ALJ erred by failing to discuss her testimony or explain why he found it was not more likely than true as based on the record. *Plessinger*, 900 F.3d at 916; *Martinez*, 630 F.3d at 697; *Golembiewski*, 322 F.3d at 916; *Scott,* 297 F.3d at 589.

The ALJ's omission was harmful because the mother testified in detail about Plaintiff's meltdowns. (AR 43-44, 54-55, 252-53.) This evidence was key in determining Plaintiff's vocational ability and specifically whether he could tolerate occasional interaction with supervisors. (*See* AR 18.) In any work setting, Plaintiff would be exposed to groups of co-workers or supervisors. Plaintiff's mother testified his meltdowns were caused by being overwhelmed with stimuli usually in the form of too many people around him talking and interacting. (AR 43,

54-55.) A meltdown is therefore likely to be triggered in a work setting and would keep Plaintiff off-task and furthermore distract his co-workers. According to SSR 96-8p, the ALJ was required to explain why the allegations of meltdowns could or could not be reasonably accepted as consistent with the evidence. In error, neither the ALJ nor the Commissioner explained whether the mother's testimony on meltdowns was consistent with the record. (AR 20); SSR 96-8p; *Plessinger*, 900 F.3d at 916; *Martinez*, 630 F.3d at 697; *Golembiewsk*i, 322 F.3d at 916; *Scott*, 297 F.3d at 589.

The Commissioner also argues that the ALJ did not independently determine which medical findings were normal and which were not. However, the Commissioner misstates Plaintiff's argument, which was that the ALJ was unqualified to determine the significance of normal medical findings with respect to Plaintiff's limitations. For example, the ALJ highlighted that although a March 2012 EEG scan showed abnormal left temporal theta slowing, a subsequent April 2013 EEG scan showed no abnormality. (AR 20.) This result does not permit the ALJ to conclude Plaintiff has no brain abnormalities with respect to seizure activity because the authoring physician of those scans did not make that conclusion (AR 404) and furthermore left temporal theta slowing can be intermittent depending on the severity of someone's dysfunction. Thus, the significance of a normal EEG scan is more complicated than the ALJ suggested and did not permit him to make an independent medical finding that one normal EEG scan meant that Plaintiff's seizure activity was less severe than alleged. (AR 20); *Myles*, 582 F.3d at 677-78.

The Commissioner also argues there is evidence that Plaintiff did not need help completing daily chores as alleged. However, Plaintiff argued there is evidence that does show he needed help with daily chores and the ALJ needed to address that evidence. For example, Plaintiff

required frequent reminders to perform chores (AR 44-45, 250) and attend to personal hygiene (AR 241, 250.) The ALJ erred by not addressing this evidence in his decision. This omission was harmful because the vocational expert testified stated that the someone who requires reminders on simple tasks more than once a week would be precluded from all work. (AR 19, 62, 44-45, 250); *Yurt*, 758 F.3d at 859; *Golembiewski*, 322 F.3d at 917; *Bailey v. Barnhart*, 473 F.Supp.2d 822, 840 (N.D. Ill. 2006) (an ALJ's failure to address a claimant's limitation that a vocational expert testified would preclude her from work raised a "red flag" that needed to be addressed on remand); *see also Potrebic v. Berryhill*, 2019 WL 1397477 at *2 (N.D. Ind. Mar. 27, 2019) ("The ALJ may not ignore relevant evidence and opinions offered by the [vocational expert] without explanation"). If there is evidence that conflicts with the ALJ's conclusion, the ALJ has the responsibility of resolving that conflict. *Diaz v. Charter*, 55 F.3d 300, 306 n.2. (7th Cir. 1995) (citing *Stephens v. Heckler*, 766 F.3d284, 287 (7th Cir. 1985).

      The Commissioner also argues that the ALJ properly credited the reviewing State agency doctors' opinion on Plaintiff's subjective allegations. The Commissioner argues that these doctors only partially credited Plaintiff's allegations because they noted his activities of daily living were normal and his concentration was only moderately impacted. However, in contradiction, these same doctors found that Plaintiff's alleged intensity, persistence, and limiting effects of his symptoms were substantiated by the objective evidence alone. (AR 74-75, 87.) Per SSR 16-3p and 20 C.F.R. 404.1529, if State agency doctors make such a finding, the analysis ends at that finding, and the individual is disabled. The ALJ did not rely on that finding and only relied on the part of the State agency doctors' opinion that suited his conclusions. (AR 20.) The ALJ reversibly erred by not discussing the contradicting parts of their opinions and failed to draw a logical bridge

from the evidence to his conclusion. *Parker v. Astrue*, 2019 WL 3894205 at *9 (N.D. Ind. Sept. 28, 2010) (citing SSR 96-8p; *Denton v. Astrue*, 596 F.3d 419, 477 (7th Cir. 2010); *see also Strong ex rel. M.H. v. Astrue*, 2012 WL 6186831 at *9 (N.D. Ill. Dec. 12, 2012) (ALJ erred by failing to discuss the credibility findings of State agency non-examining consultative physicians). The Commissioner makes the same mistake by failing to consider the State agency doctors' decisions as a whole and explaining why their opinions that Plaintiff's allegations were only partially consistent with the record was more convincing than their other findings that Plaintiff's allegations were substantiated by the evidence alone.

This court concludes that remand is required on all the above issues relating to the ALJ's assessment of Plaintiff's subjective allegations.

Next, Plaintiff argues that the ALJ erred by giving the opinion of Ms. Sheryl Bolin, a licensed clinical social worker, little weight in his determination. The ALJ discounted her opinion because she was not an acceptable medical source. (AR 20). However, 20 C.F.R. § 404.1527(f)(1) states that the opinion of a non-acceptable medical source may still merit greater weight than an acceptable medical source's opinion if the § 404.1527 factors favor them. *Phillips* explains that, although only licensed physicians are acceptable medical sources, other medical sources can still speak on key issues like the severity of a condition or its functional effects, and those opinions should be measured by the same criteria listed in § 404.1527. 413 Fed.Appx. at 884.

In *Pontarelli v. Colvin*, 2014 WL 3056616 at *6, the Court explained that, just because an opinion is from a non-acceptable medical source does not mean that the opinion can be disregarded outright, and in fact there are situations where an ALJ may accord greater weight to a non-acceptable medical source opinion than even to a treating physician opinion. 2014 WL

3056616 at *6. In this case, Ms. Bolin and Plaintiff have a lengthy treatment relationship that affords Ms. Bolin greater weight under the § 404.1527 factors and her opinion speaks to the severity and functional effect of Plaintiff's mental limitations which are key issues to consider in the residual functional capacity assessment. (AR 20, 429, 472.) The record evidenced a lengthy treatment relationship between Ms. Bolin and Plaintiff over a year from November 1, 2016 through January 19, 2018, in 20 assessments including a medical statement for his disability claim. Yet, the ALJ did not explain how he weighed Ms. Bolin's opinion according to the § 404.1527 factors when making his residual functional capacity assessment. (AR 20, 429, 472.)

For example, consistency is one of the factors enumerated in § 404.1527(c). Consistency is a measure of how consistent a medical opinion is with other opinions and treatment notes in the record. § 404.1527(c)(4). Ms. Bolin's opinion noted anxiety (AR 448, 472), autism and difficulty socializing (AR 455, 463, 472), difficulty concentrating (AR 465), difficulty remembering (AR 450, 465, 491), which are consistent with medical opinions on record. Dr. Walters' opinion corroborated those noted difficulties by his diagnosis of autism and anxiety disorders and further noted Plaintiff's mother's reports of memory issues stemming from left temporal lobe damage due to seizures as a child, as well as difficulty in concentration, and anxiety around people and crowds. (AR 314.) If the ALJ had properly considered this evidence, which is consistent with Ms. Bolin's opinion, then he likely would not have found her opinion inconsistent with the record. § 404.1527; *Phillips*, 413 Fed.Appx. at 884. It should also be noted that while many of the treatment notes are a reflection of what Plaintiff and his mother told Ms. Bolin and health practitioners, the ALJ is prohibited from giving the opinion less weight as mental health assessments will always be based in part on what a claimant reports. *Price*, 794 F.3d at 840

(assessments should not be rejected for being based on subjective complaints of the patient).

The ALJ also erred by concluding that Plaintiff's ability to play video games, identify the president, and remember three cities after five minutes as noted by Dr. Walters contradicted Ms. Bolin's opinion, and meant that he had the sufficient memory to do repetitive tasks after minimal training. (AR 20); SSR 86-8p; *Myles*, 582 F.3d at 677-78; *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004); *Golembiewski*, 322 F.3d at 917; *White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999). First, SSR 86-8 prohibits an ALJ from substituting his own speculation for evidence. In this case, the ALJ speculated that Plaintiff had sufficient memory to do repetitive tasks after minimal training without explaining how the evidence supported that conclusion. (AR 20); *White ex rel. Smith*, 167 F.3d at 375 ("Speculation is, of course, no substitute for evidence, and a decision based on speculation is not supported by substantial evidence."). Second, *Young* requires an ALJ to articulate their assessment sufficiently so that a court can trace a logical bridge from the evidence to his conclusion but the ALJ did not explain the significance of these three findings and how they contradicted Ms. Bolin's opinion or how it meant Plaintiff had the sufficient memory to do repetitive tasks after minimal training. (AR 20); 362 F.3d at 1002. Third, *Myles* prohibits an ALJ from making an independent medical finding based on objective medical evidence in the record, but the ALJ concluded that the results of Dr. Walters memory tests meant Plaintiff had sufficient memory to do repetitive tasks after minimal training when Dr. Walters made no such conclusion in her examination. (AR 19, 313-14); 582 F.3 at 677-78. Fourth, *Golembiewski* prohibits an ALJ from mischaracterizing evidence and the ALJ mischaracterized Dr. Walters' memory test by citing that Plaintiff made successful recollections. The test Dr. Walters administered required recollection of four presidents, and Plaintiff was only able to recall

two of the most recent presidents. (AR 19, 313.) *Golembiewski*, 322 F.3d at 917.

The ALJ further erred by failing to address the rest of Ms. Bolin's findings before discounting them. (AR 19); *Godbey v. Apfel*, 238 F.3d 803, 809 (7th Cir. 2000) (Court found that it could not discern if an ALJ adequately considered evidence when he rejected it without explaining his reasoning for doing so). Therefore the ALJ violated SSR 86-8 by speculating that Plaintiff had sufficient memory to do repetitive tasks with minimal training which was an impermissible medical finding and further erred by not explaining how the evidence supported his speculation and by mischaracterizing the evidence he did cite to support his conclusion. *Myles*, 582 F.3d at 677-78; *Young*, 362 F.3d at 1002; *Golembiewski*, 322 F.3d at 917; *White ex rel. Smith*, 167 F.3d at 375.

In response, the Commissioner argues that the ALJ did not discount Ms. Bolin's opinion because she was not an acceptable medical source but rather because her opinion was inconsistent with substantial evidence of Plaintiff's functioning. However, the ALJ only noted that Plaintiff could "play video games, recall the current and former President, and recall three out of three cities after five minutes." (AR 20.) The ALJ erred by failing to explain how any of these abilities undercut any specific limitations opined by Ms. Bolin. *Id.*; *Scrogham v. Colvin*, 765 F.3d 685, 696-97 (7th Cir. 2014) (ALJ erred by discounting a treating care provider's opinion by citing the claimant could do certain daily activities without explaining why those activities were inconsistent with the treating opinion); *Godbey v. Apfel*, 238 F.3d 803, 807-08 (7th Cir. 2000) (Court found ALJ erred by failing to discuss medical opinions in their entirety so that the reviewing court could know why he rejected an opinion). The ALJ's failure to explain his reasoning is a reversible error because that omission prevents meaningful review of the ALJ's

decision. *Id*. Furthermore, an ability to play video games, by itself, is not substantial evidence that Plaintiff can work. *Voigt v. Colvin*, 781 F.3d 871, 878-79 (7th Cir. 2015) (ALJ erred by failing to explain how playing video games meant the claimant had the concentration and persistence for competitive work). The Commissioner asserts that the ALJ's conclusion was appropriate but does not offer any explanation as to why and thus makes the same errors as the ALJ. *Voigt*, 781 F.3d at 878-79; *Scrogham*, 765 F.3d at 696-97; *Godbey*, 238 F.3d at 807-08.

The Commissioner also engages in post-hoc rationalization of the ALJ's reasoning by citing State agency opinions and how they were inconsistent with Ms. Bolin's opinion. (AR 20); *Hardy*, 908 F.3d at 313. The ALJ did not rely on this reasoning in his decision and the Commissioner cannot rationalize the ALJ's decision based on reasoning the ALJ did not engage in. *Id*.

The Commissioner also asserts that the ALJ did not discount Ms. Bolin's opinion for not being an acceptable medical source. The Commissioner argues that the ALJ simply "noted" that Ms. Bolin was not an acceptable medical source. However, the Commissioner improperly speculates that the ALJ did not rely on this fact, given that the ALJ mentioned it in the decision.

The Commissioner also argues that because Ms. Bolin's opinion was based entirely on Plaintiff's and his mother's statements it was reasonably discounted by the ALJ. However, Ms. Bolin did not base her opinion entirely on Plaintiff's and his mother's statements, but rather, took them into account when summarizing her findings. For example, Plaintiff expressed reluctance in engaging in any therapy including speaking with Ms. Bolin about his problems. (AR 436, 438, 448.) However, Ms. Bolin observed that he had to be coaxed into speaking by using the subject of video games to entice him. (AR 467.) When he did begin talking Ms. Bolin further observed that

he became very animated and even smiled at one point which was a rarity for him in social interaction. *Id*. At later sessions she observed that he became more open in speaking with her and would smile more frequently when discussing subjects he liked, like video games and his old cat. (AR 470.) However, she observed that he was still anxious even as his communication increased. (AR 472.) Ms. Bolin's treatment notes do not indicate anywhere that these exam summarizations were based on what Plaintiff or his mother told Ms. Bolin. (AR 467, 470, 472.) The Commissioner also does not cite to where Ms. Bolin made conclusions based solely on Plaintiff's and his mother's statements. Thus, it is uncertain why the Commissioner argues that Ms. Bolin's statements were reasonably discounted by the ALJ for that reason. Furthermore, the ALJ did not discount Ms. Bolin's opinion because it was based solely on Plaintiff's and his mother's statements. (AR 20.) The Commissioner's attempt to rationalize the ALJ's argument on this ground is therefore more impermissible post-hoc rationalization. (AR 20); *Hardy*, 908 F.3d at 313.

In light of all the above, this Court finds that remand is warranted on the issue of the proper weight to be given to Ms. Bolin's opinion.

Next, Plaintiff argues that the ALJ erred by not explaining or citing evidentiary support for his determination that Plaintiff had the residual functional capacity to work in proximity to others and tolerate occasional interaction with supervisors. (AR 18-20); SSR 96-8p; *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). SSR 96-8p requires an ALJ to explain how evidence supports specific functional restrictions. *Briscoe*, 425 F.3d at 352 (ALJ made a reversible error by not explaining how evidence supported each conclusion). The ALJ concluded that Plaintiff could work in proximity to others, without citing evidence that supports this conclusion. This error was

harmful because the evidence shows that being in proximity to others triggered Plaintiff's conditions. (AR 18-20.) For example, Plaintiff reported that he was anxious around people and crowds (AR 313), his mother further clarified he sometimes becomes tearful around crowds and overwhelmed to the point where he could have emotional outbursts or even vomit (AR 436, 463) and sometimes he will emotionally shut down. (AR 252.) Dr. Johnson and Dr. Neville concluded Plaintiff was limited to brief, superficial interactions with others. (AR 78, 90.) Ms. Bolin, his licensed clinical social worker, noted that he had a marked limitation in working in proximity with others and interacting with the public, as well as a moderate limitation in getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 491.) The ALJ also did not explain how he made the distinction that Plaintiff could only interact with others in a brief and superficial manner but interact with supervisors for a third of the workday. (AR 18-20); see also SSR 83-10 ("'Occasionally' means occurring from very little up to one-third of the time.") The ALJ violated SSR 96-8p by failing to explain or cite evidentiary support for his residual functional capacity limitation on Plaintiff's social interaction ability. (AR 18-20); *Briscoe*, 425 F.3d at 352.

The ALJ also erred by not explaining how Plaintiff's medication side effects affected his residual functional capacity. (AR 18); SSR 16-3p; *Dorrance v. Colvin*, 2013 WL 6839909 at *20 (N.D. Ind. Dec. 27, 2013) ("A [residual functional capacity] measures not only medically determinable impairments, but related symptoms, such as pain and the side effects of medication."). SSR 16-3p requires an ALJ to discuss the side effects of medications in a residual functional capacity assessment. The ALJ did acknowledge that Plaintiff alleged his seizure medication, Levetiracetam, caused him drowsiness, and furthermore drowsiness is a common side

effect of this medication, but the ALJ did not explain how this drowsiness affected Plaintiff's residual functional capacity. (AR 18, 273.) Furthermore, the vocational expert testified that someone who is off task more than 15% of the time would be precluded from all work, and if Plaintiff's drowsiness caused him to exceed this off-task threshold then he would have been precluded from all work. (AR 63.) Plaintiff would typically nap through the day and needed a nap in the morning between breakfast and lunch and a nap from 9:00 a.m. to 12:00 p.m. which would amount to three hours out of an eight-hour workday, and add up to 37.5% off-task time. (AR 49, 248-49.) By failing to address this side effect the ALJ made an incomplete residual functional capacity assessment that does not fully encompass Plaintiff's limitations. SSR 16-3p; *Dorrance*, 2013 WL 6839909 at *20.

In response, the Commissioner argues that the ALJ properly assessed Plaintiff's mental RFC. In part, the Commissioner argues that Plaintiff's school records were inconsistent with Plaintiff's allegations he could not be near others. However, this is more post-hoc rationalization of the ALJ's argument because the ALJ did not cite to school records to counter Plaintiff's alleged social limitations. (AR 19); *Hardy*, 908 F.3d at 313. The ALJ only mentioned that Plaintiff had undergone an individualized education plan due to his autism. (AR 20). The Commissioner also argues that the failure to explain Plaintiff's drowsiness side effect on his RFC was harmless because Plaintiff did not allege it caused any functional limits. However, Plaintiff pointed out that his drowsiness forced him to take naps which could lead him to be off-task beyond competitive thresholds for work. The Commissioner also argues that Plaintiff denied side effects to his doctor but that does not allow the Commissioner nor the ALJ to conclude that there were no side-effects as a Plaintiff may not mention them if the benefits outweighed the side

effects. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). Here, Plaintiff's anti-seizure medication caused drowsiness, but was necessary to help control his seizures. (AR 18, 273).

As Plaintiff has shown that the ALJ failed to properly assess Plaintiff's mental RFC, remand is warranted on this issue also.

## Conclusion

On the basis of the foregoing, the decision of the ALJ is hereby REMANDED for further proceedings consistent with this Order.


Entered: February 7, 2020.


s/ William C.  Lee
William C. Lee, Judge
United States District Court